**United States District Court**

For the Northern District of California

1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                          NORTHERN DISTRICT OF CALIFORNIA

7

8    JOY YOSHIOKA,                              No. C-11-1625 EMC

9              Plaintiff,

10        v.                                    **ORDER DENYING MOTION FOR**
                                                **FINAL APPROVAL OF PROPOSED**
                                                **CLASS ACTION SETTLEMENT;**
11   CHARLES SCHWAB CORPORATION, *et*           **DENYING MOTION FOR**
     *al.*,                                     **ATTORNEY'S FEES AND INCENTIVE**
                                                **AWARD; DENYING MOTION FOR**
12                                              **MANDATORY INTERVENTION; AND**
13             Defendants.                      **STAYING ACTION**
     _____/
14                                              **(Docket Nos. 104, 45, 85)**

15

16

17        On April 4, 2011, Plaintiff Joy Yoshioka brought suit on behalf of herself and a putative

18   class of all current holders of against Charles Schwab Individual Retirement Accounts ("IRA").  She

19   brought claims for violations of the California Consumer Legal Remedies Act ("CLRA"), the

20   California Unfair Competition Law ("UCL"), breach of contract, and breach of fiduciary duty,

21   seeking damages and declaratory relief.  Compl., Docket No. 1.  On September 8, 2011, the Court

22   granted a motion for preliminary approval of the class action settlement and conditionally certified

23   the class.  Docket No. 44.  Pending before the Court are the parties' motion for final approval of

24   class action settlement, Docket No. 104, one class member's motion to intervene, Docket No. 85,

25   and Plaintiff's Counsel's unopposed motion for attorney's fees and an incentive award for Named

26   Plaintiff, Docket No. 45.  After considering the parties' submissions, class members' objections, and

27   oral arguments, the Court hereby enters the following order.

28

**United States District Court**
For the Northern District of California

# I.  FACTUAL & PROCEDURAL BACKGROUND

Plaintiff's complaint on behalf of the class alleges violations of the CLRA, UCL, breach of contract, breach of fiduciary duty, and declaratory relief.  According to Defendants' records, the putative class comprises over four million IRA account holders containing upwards of $384 billion in assets.  Mot. for Prelim. App. at 5 (citing Bakhtiari Decl. ¶ 4).  Plaintiff alleges that, through their standard IRA agreements, "Defendants take security interests in the assets of [the account holder], causing premature distributions under IRS regulations."  Compl. ¶ 1.  Specifically, she alleges that paragraphs 6 and 7 of the IRA account agreement "created liens and security interests in the assets in the IRA and other investment accounts of the IRA holder, in favor of Defendants."  Mot. for Prelim. App. at 4.  Paragraph 7, entitled Security for Indebtedness, states,

> As security for the repayment of all present of future indebtedness owed to us by any Schwab IRA account holder under the Account Agreement or otherwise, each Schwab IRA account holder grants us a continuing security interest in and lien on, and a right of setoff with respect to, all securities and other property that are, now or in the future, held, carried, or maintained for any purpose in or through the Schwab IRA and, to the extent of this account holder's interest, in or through any present or future Account with us or our affiliates in which the account holder has an interest.

Compl. ¶ 8.  Paragraph 6 of the IRA agreement, titled Payment of Indebtedness, states,

> You agree to make payment of any indebtedness related to your Account, including, but not limited to, any such indebtedness that results from instructions provided to Schwab by you, your agent or any attorney-in-fact under a power of attorney or Investment Advisor authorized to make transactions in your Account.  We may elect anytime, with or without notice, to make any debit balance or other obligation related to your Account immediately due and payable.  We may report any past-due account to a consumer and/pr securities credit reporting agency.  We may also refer your Account to a collection agency.

Compl. ¶ 15.  Plaintiff alleges that these paragraphs result in a "prohibited transaction" (defined by 26 U.S.C. § 4975(c)(1)(B) as the direct or indirect "lending of money or other extension of credit between a plan and a disqualified person"), which causes an IRA account to lose its tax exempt status under 26 U.S.C. § 408(e)(2).  Compl. ¶¶ 8-17. Plaintiff's complaint seeks declaratory and injunctive relief as well as restitution, disgorgement, actual and punitive damages, and an order imposing a constructive trust.  Compl. At 13-14.

United States District Court
For the Northern District of California

1    Defendants deny the allegations, noting that the key provision (paragraph 7)of the agreement

2  at issue was deleted by December 31, 2010, and that the Schwab IRA Plan language protects against

3  the alleged prohibited transactions.  Def's Response to Obj., Docket No. 101, at 3.  Defendants also

4  deny that Plaintiff or members of the putative class have suffered damages.  Mot. for Prelim. App. at

5  5.

6        Prior to filing the complaint, Plaintiff sent a CLRA demand letter to Defendants pursuant to

7  Cal. Civ. Code § 1782(a)(2).  Mot. for Prelim. App. at 5.  The parties met and conferred at that point,

8  and subsequently engaged in informal discovery, including the release of information regarding the

9  number of Schwab IRA accounts, the IRA account agreement forms for the past five years,

10 "confirmation that Schwab never debited an IRA to satisfy a debt from another non-IRA account";

11 and "confirmation that creditors had not utilized the alleged offending information as part of a

12 garnishment, attachment, or execution."  Id. at 5-6.

13       On May 9, 2011, the parties jointly stipulated to stay all proceedings so that they could

14 engage in mediation.  Docket No. 10.  The Court issued an order to that effect on May 24, 2011.

15 Docket No. 16.  Defendants have never filed an answer in the litigation and there have been no

16 motions from either side.

17       On June 15, 2011, the parties began settlement negotiations with a mediator and entered into

18 an initial Stipulation of Settlement on the same day without negotiating attorney's fees or incentive

19 awards.  Mot. for Prelim. App. at 3.  The parties later negotiated attorney's fees and the incentive

20 award for Plaintiff Yoshioka, and the Settlement was finalized on July 25, 2011. Mot. for Prelim.

21 App. at 6.

22       The settlement class is defined as all current and former IRA account holders within the class

23 period between January 1, 2005, and the date of Final Judgment, excluding Defendants and any

24 entity in which Defendants have or had a controlling interest or that is a parent or subsidiary or is

25 controlled by Defendants.  Settlement Agreement, Docket No. 43, Ex. A ¶ 1.18 ("Settlement

26 Agreement"). The final Settlement provides for amended account language as requested by Plaintiff.

27 Mot. for Prelim. App. at 3.  Specifically, Defendants agreed to amend their IRA agreements to

28

3

United States District Court

For the Northern District of California

retroactively[1] void any alleged problematic language as of the first date on which the individual class member entered into an IRA account agreement.  *Id.*  The new language will state:

> Any language in this Account Agreement or related agreements that may conflict or be inconsistent with the Plan, including without limitation Sections 5.2 or 5.8 of the Plan, or Sections 408 or 4975 of the Internal Revenue Code, and the regulations thereunder, shall be interpreted to be consistent and in compliance with the Plan and those Sections of the Code and regulations thereunder. To the extent it is not possible to interpret such language to be consistent and compliant with the Plan or these Code provisions and regulations, then such language shall be of no force or effect to the extent of such inconsistency or noncompliance. This Section shall be effective retroactive to the first date on which the agreement concerning the Schwab IRA was entered into by the Account Holder.

Settlement Agreement ¶ 2.1. This is the only relief offered; there is no monetary distribution to the class.

Following preliminary approval of the Settlement, the Class received notice through a regularly-scheduled Schwab email containing: the general terms of the settlement agreement, the date of the Final Approval Hearing, a link to a website with frequently asked questions and the stipulation of settlement, a toll free number for class members to call with questions about the settlement, maintained by live trained operators, and information regarding members' rights to object to the settlement.  Settlement Agreement ¶ 4.1.  Schwab tracked the number and nature of calls to the hotline.  *Id.*[2]  Schwab will further send the amendment to all current account holders within 90 days after the judgment becomes final.  *Id.* ¶ 2.1; Mot. for Prelim. App. at 7.  Class Members agree to release all claims relating to the instant action and claims that entering into the IRA agreement caused a prohibited transaction or distribution of the IRA.  Settlement Agreement ¶

---

[1]  The Schwab IRA plan permits Schwab to make retroactive amendments to the Plan.  Mot. for Prelim. App. at 7 ("Under the terms of the Schwab IRA Plan, Schwab is permitted to make retroactive amendments to the Plan, account agreement and related agreements to conform to applicable law, regulation or ruling, and Schwab and each IRA account holder are permitted to make amendments by agreement.").

[2]  It does not appear that the parties have submitted any information to the Court regarding the nature and extent of any calls received to the hotline.

**United States District Court**
For the Northern District of California

1  1.14.³  While

3  ³ "Released Claims" are defined as:

all claims (including Unknown Claims as defined in paragraph 1.21 hereof), demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, contingent or absolute, mature or immature, discoverable or undiscoverable, whether concealed or hidden, suspected or unsuspected, which now exist, or heretofore have existed, or which were asserted or which could have been asserted by the Plaintiff or any Settlement Class Member against the Defendants and their Related Parties based upon or arising out of (a) the facts, transaction, events, occurrences, disclosures, statements, acts, omissions or failures to act which were alleged in the Litigation or (b) a claim that entering into a Schwab Individual Retirement Account ("IRA") agreement or related Schwab agreement, or any amendments thereto, by the Plaintiff or any Settlement Class Member caused a prohibited transaction or a distribution of an IRA account.

"Unknown Claims" are further defined in 1.21 as:

collectively any Released Claims that the Plaintiff or any Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Released Parties which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Parties, or might have affected his, her or its decision not to object to this Settlement.  With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Plaintiff shall expressly waive, and each of the Settlement Class Members shall be deemed to have waived, and by operation of the Judgment shall have waived, the provisions, rights, and benefits of California Civil Code Section 1542, which provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Plaintiff shall expressly waive and each of the Settlement Class Members shall be deemed to have waived, and by operation of the Judgment shall have, expressly waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code Section 1542. Plaintiff and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Plaintiff shall expressly, fully, finally and forever settle and release, and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or

United States District Court
For the Northern District of California

1  Class Members had a right to object, they have no right to opt out. *See* Notice, Docket No. 23-1,

2  Exh. A-1, at 2.  The Court has received and filed 36 letters from purported class members objecting

3  to the settlement or attempting to opt out, but four of those appear to be invalid as they are not from

4  valid class members.

5  ## II.   DISCUSSION

6  A.   The Proposed Settlement

7      If a proposed settlement agreement is binding on class members, as is the case here, the

8  Court "may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."

9  Fed. R. Civ. P. 23(e)(1)(C).  This Court has discretion to approve or deny a proposed settlement, and

10  the Court's decision cannot be overturned absent a clear abuse of discretion.  *Hanlon v. Chrysler*

11  *Corp.*, 150 F.3d 1011, 1026-27 (9th Cir. 1998).  However, the Court may not pick and choose

12  portions of a proposed agreement.  *Id.* at 1026.  As the Ninth Circuit has noted, "Settlement is the

13  offspring of compromise; the question . . . is not whether the final product could be prettier, smarter,

14  or snazzier, but whether it is fair, adequate, and free from collusion."  *Id.*

15      If the parties "reach a settlement agreement prior to class certification, the court is under an

16  obligation to 'peruse the proposed compromise to ratify both the propriety of the certification and

17  the fairness of the settlement.'"  *Singer v. Becton Dickinson & Co.*, No. 08-CV-821-IEG, 2010 WL

18  2196104 (S.D. Cal. June 1, 2010) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003));

19  *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

20      1.   Class Certification

21      When evaluating whether approval is warranted for a proposed class settlement, the Court

22  must determine whether the class is proper for settlement purposes.  *Amchem Products, Inc. v.*

23  _____

24      heretofore have existed, upon any theory of law or equity now existing
    or coming into existence in the future, including, but not limited to,

25  conduct which is negligent, intentional, with or without malice, or a
    breach of any duty, law or rule, without regard to the subsequent

26  discovery or existence of such different or additional facts.  Plaintiff
    acknowledges, and the Settlement Class Members shall be deemed by

27  operation of the Judgment to have acknowledged, that the foregoing
    waiver was separately bargained for and a key element of the

28  Settlement of which this release is a part.

**United States District Court**

For the Northern District of California

1   *Windsor*, 521 U.S. 591, 620 (1997). "[A] district court need not inquire whether the case, if tried,

2   would present intractable management problems . . . for the proposal is that there be no trial." *Id.*

3   (citations omitted).  However, "other specifications of the Rule-those designed to protect absentees

4   by blocking unwarranted or overbroad class definitions-demand undiluted, even heightened,

5   attention in the settlement context." *Id.*

6          In this case, Plaintiffs seek class certification pursuant to Rule 23(a) and (b)(2) of the Federal

7   Rules of Civil Procedure.  Rule 23(a) permits Plaintiffs to sue as representatives of a class only if

8          (1)   the class is so numerous that joinder of all members is impracticable;

9          (2)   there are questions of law or fact common to the class;

10         (3)   the claims or defenses of the representative parties are typical of the claims or
             defenses of the class; and

11
12         (4)   the representative parties will fairly and adequately protect the interests of the
             class.

13   Failure to meet any of the criteria defeats the motion.  *Rutledge v. Elect. Hose & Rubber Co.*, 511

14   F.2d 668, 673 (9th Cir. 1975).  In addition, a purported class must be certified under Rule 23(b) by

15   satisfying any one of its prongs.  Plaintiffs seek certification under 23(b)(2), which permits a class if

16   "the party opposing the class has acted or refused to act on grounds that apply generally to the class,

17   so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as

18   a whole."

19          a.   23(a)

20               i.   Numerosity

21          Plaintiffs satisfy the numerosity requirement if "the class is so large that joinder of all

22   members is impracticable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1101, 1019 (9th Cir. 1998).  In this

23   case, the purported class is made up of over four million Schwab IRA account holders.  *See* Mot. for

24   Prelim. App. at 5.  Plaintiffs easily meet the numerosity requirement. *See Wang v. Chinese Daily*

25   *News*, 231 F.R.D. 602, 607 (C.D. Cal. 2005) (100 or more plaintiffs leads to a presumption of

26   numerosity); *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1998) (finding a

27   purported class of forty members sufficient to satisfy numerosity).

28

1

ii.      Commonality

2       Plaintiffs must demonstrate that there are "questions of law or fact common to the class" in

3    order to satisfy Rule 23(a)(2).  This prong is subject to a "permissive[]" construction in the Ninth

4    Circuit.  *Hanlon*, 150 F.3d at 1019-20.  Plaintiffs need not demonstrate that all questions are

5    common to the class; rather, it is sufficient if either "shared legal issues with divergent factual

6    predicates" OR "a common core of salient facts coupled with disparate legal remedies within the

7    class" are present.  *Id.*  However, plaintiffs must "demonstrate that the class members have suffered

8    the same injury," not "merely that they have all suffered a violation of the same provision of law."

9    *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  "Even a single [common] question" will suffice

10   to satisfy Rule 23(a).  *Id.* at 2556.

11      Here, Plaintiffs satisfy the commonality requirement because they are each subject to the

12   same or similar allegedly unlawful IRA agreement provisions.  *See* Mot. for Prelim. App. at 13.  The

13   critical question posed by Plaintiffs is whether Schwab's IRA provisions result in prohibited

14   transactions that negate the IRA's tax exempt status.  This question is common to all class members

15   and its answer would apply equally to all members of the class.  *See Dukes*, 131 S. Ct. at 2551

16   ("What matters to class certification . . . is the capacity of a classwide proceeding to generate

17   common answers apt to drive the resolution of the litigation.") (quotation omitted).  Accordingly,

18   Plaintiffs have satisfied the commonality requirement.

19

iii.      Typicality

20      Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical

21   of the claims or defenses of the class."  Courts assess typicality by determining "whether other

22   members have the same or similar injury, whether the action is based on conduct which is not unique

23   to the named plaintiffs, and whether other class members have been injured by the same course of

24   conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Here, Plaintiffs satisfy

25   the typicality requirement because the same allegedly unlawful conduct on the art of Schwab – its

26   offending IRA agreement provisions – are at issue for the Named Plaintiff just as they are for the

27   class as a whole.

28

8

United States District Court
For the Northern District of California

iv.      Adequacy

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class."  "This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel."  *Dukes*, 603 F.3d at 614.

Here, Plaintiff Yoshioka satisfies the first factor because, apart from her proposed incentive award, she will receive the same relief as the class as a whole and there is no apparent conflict of interest between herself and the class.  Mot. for Prelim. App. at 14; *Cf. Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594 (1997) (finding named class inadequate where currently-injured plaintiffs would seek immediate payment and exposure-only plaintiffs would seek a long-term compensation fund).  She is also familiar with the IRA agreement provisions at issue, since they are the same or similar as those pertaining to other class members, and can represent the interests of the class.  Mot. for Prelim. App. at 14; *Cf. Kassover v. Computer Dep.*, 691 F. Supp. 1205, 1213 (D. Minn. 1987) (finding inadequacy where "plaintiff admitted at several points he possesses 'no facts' to support essential allegations in his complaint").  While Objector Schonbrun challenged her adequacy on the basis of the fact that she is a current account holder and therefore cannot represent former account holders, *see* Docket No. 90 at 2-3, he fails to explain how this renders her inadequate.  Indeed, the proposed relief purports to change all account agreements, including those of former account holders.  To the extent that only a prospective amendment is necessary or permitted, Plaintiff Yoshioka would still possess an interest in common with other current and former account holders in securing her pre-amendment assets to the extent possible.  Mr. Garmong also challenges the fact that she has not yet withdrawn from her IRA, but it is unclear how this would render her an inadequate representative as she is still depending on the funds and subject to the legal risks alleged in the complaint common to all class members. *See* Docket No. 85 at 5 ¶ 16. In addition, as Class Counsel has pointed out, bankruptcy proceedings could render anyone's IRA subject to attachment if there was a prohibited transaction, regardless of the person's age. *See* Mot. for Final App. at 3.  Mr. Garmong additionally questioned Ms. Yoshioka's motives because she filed suit soon after she opened her IRA account with Schwab.  However, it is logical that a new

1   customer would notice alleged problems with Schwab's account agreement language, as they would

2   be most likely to review the terms of their agreement at the time they are entering into said

3   agreement.  The Court therefore concludes there is nothing in the record establishing she has any

4   conflict of interest with class members.

5         Regarding the second prong, Plaintiff is represented by competent counsel with substantial

6   experience in complex nationwide class action litigation.  *See* Bakhtiari Decl., Docket No. 23, ¶¶ 8-

7   13; Kirk Decl. Exh. A; Bakhtiari Decl., Docket No. 23-3, Exh. A; Berry Decl. Exh. A.  Accordingly,

8   Plaintiffs have satisfied the adequacy criterion.

9                b.     23(b)(2)

10         Rule 23(b)(2) mandates class certification if "the party opposing the class has acted or

11   refused to act on grounds that apply generally to the class, so that final injunctive relief or

12   corresponding declaratory relief is appropriate respecting the class as a whole." "The key to the

13   (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion

14   that the conduct is such that it can be enjoined or declared unlawful only as to all of the class

15   members or as to none of them."  *Dukes*, 131 S. Ct. At 2557 (internal quotations omitted).  Plaintiffs

16   satisfy the requirement in this case because the requested relief, and the relief to be provided

17   pursuant to the Settlement Agreement, consists of a single amendment to the IRA agreement that

18   would apply class-wide.[4]

19              2.     Fairness of the Settlement

20         Pursuant to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a

21   certified class may be settled, voluntarily dismissed, or compromised only with the court's

22   approval."  As the Ninth Circuit explained, "[t]he purpose of Rule 23(e) is to protect the unnamed

23   members of the class from unjust or unfair settlements affecting their rights."  *In re Syncor ERISA*

24   *Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008).  Accordingly, before a court approves a settlement it

25   must conclude that the settlement is "fundamentally fair, adequate and reasonable."  *In re Heritage*

---

27       [4]  Though Plaintiffs' complaint seeks money damages, the settlement does not.  Therefore, certification of the class under 23(b)(2) for purposes of settlement remains appropriate. *See Dukes*,

28   131 S. Ct. At 2557 (Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages").

**United States District Court**

For the Northern District of California

1    *Bond Litig.*, 546 F.3d 667, 674-75 (9th Cir. 2008).  Generally, the district court's review of a class

2    action settlement is "extremely limited."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.

3    1998).  The Court considers the settlement as a whole, rather than its components, and lacks the

4    authority to "delete, modify or substitute certain provision."  *Id.*  (quoting *Officers for Justice v.*

5    *Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 630 (9th Cir.1982)).  Rather, "[t]he settlement

6    must stand or fall in its entirety."  *Id.*

7         Before granting final approval, *Hanlon* identifies several factors the Court should consider in

8    evaluating a proposed settlement agreement:

9              [T]he strength of the plaintiffs' case; the risk, expense, complexity,
             and likely duration of further litigation; the risk of maintaining class
10             action status throughout the trial; the amount offered in settlement; the
             extent of discovery completed and the stage of the proceedings; the
11             experience and views of counsel; . . . and the reaction of the class
             members to the proposed settlement.
12

13    *Id.*; *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000) (same).  However,

14    the final fairness determination must rest on "the settlement taken as a whole, rather than the

15    individual component parts."  *Id.* at 1026.

16         In the instant case, the Court concludes that the parties have not demonstrated the fairness

17    and adequacy of the settlement.

18              a.    Strength of Plaintiff's Case/Risk of Litigation

19         Should Plaintiff prevail in proving Schwab was responsible for creating a prohibited

20    transaction, Schwab's exposure would be substantial.  First, it may be responsible for any tax

21    liability incurred by Plaintiff.  Second, Plaintiff faces an additional risk of liability to third parties.

22    IRAs are typically exempt from a debtor's estate in bankruptcy so long as they maintain their

23    exemption from taxation.  11 U.S.C. § 522(b)(3)(c) (exempting "retirement funds to the extent that

24    those funds are in a fund or account that is exempt from taxation under [various sections] of the

25    Internal Revenue Code of 1986").  However, that exemption no longer applies when a prohibited

26    transaction takes place.  *See, e.g., In re Meredith*, No. 03-34018-DOT, 2005 Bankr. LEXIS 2798, at

27    *20 (Bankr. E.D. Va. May 19, 2005) ("Because the transaction was made by a fiduciary and

28    constituted a prohibited transaction under § 4975, the SEP-IRA lost its status as an exempt account

**United States District Court**
For the Northern District of California

1  under § 408(e)(2). Therefore, it does not qualify as exempt property."); *Nu-Way Energy Corp. v.*

2  *Delp*, 205 S.W.3d 667, 682-83 (Tex. App. 2006) ("Because Delp engaged in a prohibited transaction

3  in December 1992, his IRA 'cease[d] to be an individual retirement account as of the first day of

4  such taxable year' [pursuant to] 26 U.S.C.A. § 408(e)(2)(A)" and therefore "it is no longer exempt

5  from creditors under [state law]."). Accordingly, should the Schwab IRAs at issue here be deemed

6  to have entered into a prohibited transaction because of the disputed language in the account

7  agreements, class members' IRAs may no longer be protected from creditors.

8        Indeed, Plaintiff points to a bankruptcy court case finding that similar language in a Merrill

9  Lynch ("ML") IRA created a prohibited transaction, thereby exposing a debtor's IRA to attachment

10  in bankruptcy. *See In re Daley*, --- B.R. ----, 2011 WL 4806905 (Bankr. E.D. Tenn. Oct. 10, 2011);

11  *see also In re Kaminsky*, No. 1-09-47942-JBR, 2010 WL 4026378, at *2-3 (Bankr. E.D.N.Y. Oct.

12  13, 2010) (considering ML's motion to "liquidat[e] the funds in the Debtor's IRA Account based

13  upon the language of the Agreement granting a lien on any and all assets held in any Merrill Lynch

14  account in which the Debtor has an interest," and ordering that "the Debtor's IRA Account should

15  be turned over to the Chapter 7 Trustee who shall hold the funds pending any exemption claim").

16  The court in *Daley* determined that, although "the Debtor never borrowed from his IRA account or

17  requested a margin loan against his funds," his client relationship agreement with ML – which

18  applied to "all of his accounts with Merrill Lynch" – provided that ML "has a lien on [his] accounts

19  and amounts in those accounts for any payment obligations [he has] with Merrill Lynch[.]" *Id*. at *7.

20  The court concluded that "[t]his grant of a lien at the IRA's inception constituted an extension of

21  credit or guarantee, which is a prohibited transaction under 26 U.S.C. § 4975(c)(1)(B)." *Id.* It held

22  further that "[a]s incongruous as it appears, based upon the language of the Client Relationship

23  Agreement signed by the Debtor, the *mere opening* of the Merrill Lynch IRA caused the Debtor to

24  participate in a prohibited transaction under § 4975." *Id.* (emphasis added).

25        While *Daley* involved account language different from that employed by Schwab,[5] it is not

26  ────────────────

27      [5] The Merrill Lynch ("ML") agreement stated that in part ML "has a lien on [his] accounts and amounts in those accounts for any payment obligations [he has] with Merrill Lynch[.]" *Id.* at *7.

28  Paragraph 7 of the Schwab agreement states that "[a]s security for the repayment of all present of future indebtedness owed to [Schwab] . . . , *each Schwab IRA account holder grants [Schwab] a*

United States District Court

For the Northern District of California

1    clear that the difference is material.  Importantly, the bankruptcy court relied on a Department of

2    Labor opinion addressing similar language to conclude that a prohibited transaction occurs whether

3    the security interest is "in a client's personal, non-IRA accounts," or directly "in the IRA's assets."

4    *Id.* at *7-8 (citing and quoting Dep't of Labor Op. No. 2009-03A at 1-3, 2009 ERISA LEXIS 2 (Oct.

5    27, 2009) ("It is the opinion of the Department that the grant by an IRA owner to the Broker of a

6    security interest in his non-IRA accounts in order to cover indebtedness of, or arising from, his IRA,

7    as you describe, would be a prohibited transaction under Code section 4975(c)(1)(B).").[6]

8         While Plaintiff's interpretation of the Schwab agreement has support, Defendants, in their

9    response to class members' objections, maintain their position that the Schwab language does not

10   create a prohibited transaction.  Defendants first point out that the IRS approved the Schwab IRA

11   Plan on June 5, 2003.  *See* Def's Resp. to Obj. at 2 n.4.  They also argue that, when read properly,

12   neither paragraph 6 nor paragraph 7 creates a prohibited transaction.  *See* Def's Resp. to Obj. at 3

13   ("Thus when read properly, Section 7 solely creates a security interest in the customer's Schwab

14   IRA account for IRA debts, not a security interest in the IRA owner's non-IRA assets as Plaintiff

15   alleges."); *id.* at 4 (arguing that paragraph 6 cannot be construed to create a prohibited transaction

16   because "[a]n indebtedness greater than the IRA assets could not occur in an IRA account, since it is

17   not permitted to trade on margin").  Defendants note further that certain language in the Schwab

---

*continuing security interest in and lien on*, and a right of setoff with respect to, *all securities and other property* that are, now or in the future, held, carried, or maintained for any purpose in or through the Schwab IRA and, to the extent of this account holder's interest, in or through any present or future Account with [Schwab] or [Schwab's] affiliates in which the account holder has an interest." (emphasis added).   Paragraph 6 also states more vaguely that Schwab "may elect anytime, with or without notice, to make any debit balance or other obligation related to your Account immediately due and payable.  [Schwab] may report any past-due account to a consumer and/pr securities credit reporting agency.  [Schwab] may also refer your Account to a collection agency." Paragraph 7 is more directly analogous to the ML language.

[6]  The agreement language at issue in the Department of Labor opinion letter states, in part: "All securities and other property now or hereafter held, carried or maintained by us in our possession or control, for any purpose, in or for the benefit of any of your Accounts, now or hereafter opened, including any Account in which you may have an interest, shall be subject to a continuing first lien and first priority perfected security interest in favor of us for the discharge of all indebtedness and your obligations to us, and are to be held by us as security for the payment of any liability or indebtedness of yours to us in any of your accounts. . . . You authorize us the right to transfer securities and other property so held by us from or to any other of your Accounts held by us, whenever, in our judgment, we consider such transfer necessary for our protection . . . ."  Dep't of Labor Op. at *2.

**United States District Court**
For the Northern District of California

1   IRA Plan precludes the IRA holder from engaging in a prohibited transaction, *see* Def's Resp. to

2   Obj. at 2; Insley Decl., Ex. A (Plan), ¶ 5.2, and that where a Plan conflicts with other documents

3   incorporated into the Plan by reference (such as the account agreement at issue here), the Plan

4   generally controls, thereby protecting class members from any misunderstanding about the meaning

5   of paragraphs 6 and 7 in the account agreement.  Def's Resp. to Obj. at 2.  Finally, they argue that

6   paragraph 7 of the account agreement was removed effective January 1, 2011, and is thus no longer

7   a problem for class members (although it is unclear whether this change would prevent adverse

8   consequences to accounts that were open in the period before the change).  Yet, the literal language

9   of Paragraphs 6 and 7 appear problematic, especially in light of *Daley*.

10          Defendants' arguments highlight the risks of litigation for both parties, as each side's claims

11  depend on a particular reading of the account language, a reading which may or may not be adopted

12  by reviewing courts.  *See, e.g.*, *Daley*, 2011 WL 4806905 at *7 (concluding that the agreement to

13  provide a line of credit or security interest, regardless of how or whether that agreement is later

14  enforced, causes a prohibited transaction); Dep't of Labor Op. No. 2009-03A at *5 (discussing ways

15  in which similar account language could create a prohibited transaction).  Accordingly, while

16  Plaintiff has at least raised a question as to the merits of her underlying claims on behalf of the class,

17  that question does not yield to a certain answer as Defendant's contrary contentions illustrate.

18          Moreover, as Defendants pointed out, Plaintiffs may face procedural risks if the litigation

19  continues.  At least one court has dismissed a similar action on the grounds that plaintiffs do not

20  have standing and the claims are not ripe for adjudication, as class members have yet to suffer any

21  harm.  *See Coffey v. Merrill Lynch Pierce Fanner and Smith, Inc.*, CV-11-5860-JFW (JCx), Docket

22  No. 46, at 2 (Nov. 16, 2011) ("Plaintiff fails to allege facts that demonstrate that he has suffered an

23  actual or imminent injury, and appears to have manufactured a problem with potentially substantial

24  adverse tax consequences for many thousands of IRA owners where none yet exists.").

25          Continued litigation thus presents risks for both parties.  This raises concerns about the value

26  of the proposed settlement, to which the Court now turns.

27                  b.      The Value of the Settlement

28          The settlement provides no monetary recovery for the class.  Instead, the value of the relief

lies solely in the effect of the purported retroactive amendment to the account agreement.  That benefit must be balanced against what class members are giving up via the release.  Given the concerns raised above with respect to the possibility of a prohibited transaction, the key question is whether the proposed amended language would prevent or provide significant protection against any adverse scenarios from occurring to class members resulting from the challenged provisions.

Plaintiff portrays the proposed settlement as offering the Class the best deal it could have gotten if it had prevailed at trial.  Mot. for Final App. at 22.  The amended language purports to clarify that no portion of the Plan may be construed as creating a prohibited transaction.[7]  However, the parties offer very little in the way of assurances that the settlement will actually have its intended effect; that is, that it will actually prevent the IRS, the Tax court, the bankruptcy court, or state courts from determining that a prohibited transaction has taken place, exposing class members to creditors and loss of their tax exemption.  The parties have failed to establish with any degree of certainty or even probability that class members' assets will be protected as a result of the settlement.

First, Plaintiff argues that the proposed amendment complies with § 4975's method for correcting inadvertent prohibited transactions.  Section 4975(d)(23) provides that an otherwise prohibited transaction "in connection with the acquisition, holding, or disposition of any security or commodity" shall remain exempt from taxation "if the transaction is corrected before the end of the correction period."  Section 4975(f)(11)(A) defines a correction period as "the 14-day period beginning on the date on which the disqualified person discovers, or reasonably should have

---

[7]  The specific amended provision, as laid out in Settlement Agreement ¶ 2.1, provides,

> Any language in this Account Agreement or related agreements that may conflict or be inconsistent with the Plan, including without limitation Sections 5.2 or 5.8 of the Plan, or Sections 408 or 4975 of the Internal Revenue Code, and the regulations thereunder, shall be interpreted to be consistent and in compliance with the Plan and those Sections of the Code and regulations thereunder.  To the extent it is not possible to interpret such language to be consistent and compliant with the Plan or these Code provisions and regulations, then such language shall be of no force or effect to the extent of such inconsistency or noncompliance.  This Section shall be effective retroactive to the first date on which the agreement concerning the Schwab IRA was entered into by the Account Holder.

United States District Court

For the Northern District of California

1   discovered, that the transaction would (without regard to this paragraph and subsection (d)(23))

2   constitute a prohibited transaction."  Section 4975(f)(11)(D)(iii) defines "correct" to mean "to undo

3   the transaction to the extent possible and in any case to make good to the plan or affected account

4   any losses resulting from the transaction, and to restore to the plan or affected account any profits

5   made through the use of assets of the plan."

6           However, it is not clear that (d)(23) applies to circumstances such as the instant case.  It is

7   not clear, for example, whether the opening of, and lien on, the IRA itself would be considered an

8   "acquisition" of a "security" under the terms of the Act.  Security is defined by 26 U.S.C.A. §

9   475(c)(2) to include: "(A) share of stock in a corporation; (B) partnership or beneficial ownership

10  interest in a widely held or publicly traded partnership or trust; (C) note, bond, debenture, or other

11  evidence of indebtedness; [and] (D) interest rate, currency, or equity notional principal contract,"

12  among other things.  Subparagraph (C) could be construed to apply to this case, but (d)(23) seems

13  aimed at the use of IRA funds to acquire other interests or things, rather than simply acquiring an

14  interest in the IRA itself.  In addition, (d)(23) by its terms applies only to subparagraphs (A)-(D) of

15  subsection (c)(1), which defines prohibited transactions.[8]  However, the Department of Labor found

16  that "granting [] a security interest in the IRA's assets . . . would be using the IRA's assets 'in [the

17  IRA owner's] own interest or for his own account' in violation of section 4975(c)(1)(E)."  Dep't of

18  Labor Op. 2009-3A at *5-6.  A violation of § 4975(c)(1)(E) is not covered by (d)(23).  Thus, even if

19  (d)(23) applies, it may not completely correct the prohibited transaction if one is so found.

20          To be sure, transactions falling outside of (d)(23) may be corrected under subsection (f)(5),[9]

21  ——————————————————

22      [8]  Section 4975(c)(1) defines prohibited transactions as "any direct or indirect – (A) sale or
    exchange, or leasing, of any property between a plan and a disqualified person; (B) lending of
23  money or other extension of credit between a plan and a disqualified person; (C) furnishing of
    goods, services, or facilities between a plan and a disqualified person; (D) transfer to, or use by or
24  for the benefit of, a disqualified person of the income or assets of a plan; (E) act by a disqualified
    person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or
25  for his own account; or (F) receipt of any consideration for his own personal account by any
    disqualified person who is a fiduciary from any party dealing with the plan in connection with a
26  transaction involving the income or assets of the plan.

27      [9]  Section 4975(f)(5) provides, "The terms "correction" and "correct" mean, with respect to a
    prohibited transaction, undoing the transaction to the extent possible, but in any case placing the
28  plan in a financial position not worse than that in which it would be if the disqualified person were
    acting under the highest fiduciary standards."

United States District Court
For the Northern District of California

1   but unlike (d)(23), (f)(5) does not provide for a complete abatement of taxes.  Rather, a prohibited

2   transaction corrected under (f)(5) is still subject to the statute's first-tier penalty of "15 percent of the

3   amount involved with respect to the prohibited transaction for each year (or part thereof) in the

4   taxable period."  § 4975(a).  A correction only serves to protect the party from the full 100 percent

5   tax imposed "[i]n any case in which an initial tax is imposed by subsection (a) on a prohibited

6   transaction and the transaction is not corrected within the taxable period."  § 4975(b). The "taxable

7   period" in this case would be the time between "the date on which the prohibited transaction occurs"

8   and "the date on which correction of the prohibited transaction is completed."  § 4975(f)(2).  This

9   incorporation of a taxable time period for first-tier taxes would suggest that retroactive corrections

10  are not permitted under (f)(5), a position that is supported by at least some authority.  *See, e.g.*,

11  *Westoak Realty and Inv. Co., Inc. v. C.I.R.*, 999 F.2d 308, 311 (8th Cir. 1993) (holding that a

12  retroactive amendment to a profit sharing plan document only avoided the second-tier 100 percent

13  taxes, not the first-tier taxes, because "[i]f the statute allowed taxpayers to avoid a first tier tax

14  simply by retroactively curing the transaction, no incentive would exist to avoid the transaction in

15  the first instance").  *Westoak* suggests that if (d)(23) does not fully control the corrections in this

16  case, only a prospective correction is possible.  Thus, class members could still be exposed to tax

17  penalties during the taxable period, and at least partial attachment by creditors.

18          Second, assuming (d)(23) applies, Plaintiff claims that the 14-day correction period

19  requirement is satisfied because "[t]he Settlement Agreement was entered before any Class Member

20  had actual knowledge that the account agreement provisions resulted in a prohibited transaction,"

21  and because the amendments took effect at the same time class members gained such knowledge

22  through the class notice.  Mot for Final App. at 7.  However, Plaintiff's reading of the correction

23  period would suggest that (a) Ms. Yoshioka is already well past her correction period for her

24  account, and that she therefore may be unable to correct her prohibited transaction; and (b) if the

25  Court denies final approval of the settlement, the entire class would miss the 14-day correction

26  period.

27          In addition, the 14-day correction period begins not only when a class member has actual

28  knowledge of the purported prohibited transaction, but also when a class member "discovers, *or*

17

**United States District Court**
For the Northern District of California

1    *reasonably should have discovered*," the prohibited transaction.  § 4975(f)(11)(A) (emphasis added).

2    Class members face the risk that the IRS or other reviewing parties will find that the date by which

3    class members "should have discovered" the problem has already long passed.  For example, class

4    members received the account language in question when they first opened their IRAs, and DOL's

5    advisory opinion on the issue is now over two years old.  *See*  Dep't of Labor Op. 2009-3A.  While

6    *Daley* is a fairly recent decision from October 10, 2011, that is still well beyond 14 days ago.  The

7    parties offer no assurances that class members would not fall prey to a determination that they

8    should have corrected the transaction long ago, and therefore that any attempted correction is now

9    out of time.  Accordingly, Plaintiff has failed to demonstrate that the proffered settlement is

10   adequate in terms of complying with § 4975(d)(23)'s correction period time limits.

11          Third, assuming that the amendment satisfies the time limits imposed by (d)(23), Plaintiff

12   does not persuasively demonstrate that the amendment sufficiently corrects the transaction.[10]  For

13   example, Plaintiff does not offer any authority upholding similar retroactive amendments to

14   agreement language, nor does she provide any indication of the kind of corrections the IRS and

15   courts have deemed sufficient.  *Daley* casts doubt on whether a retroactive amendment can correct a

16   prohibited transaction deemed consummated at its inception.

17          Some objecting class members have suggested potential solutions to this uncertainty,

18   including obtaining rulings from the Department of Labor and the IRS that the proposed amendment

19   corrects any problem.  The parties have failed to do so, despite the apparent availability of such

20   assurances.  *See, e.g.*, IRS PLR 8405018, 1983 WL 202261 (Oct. 28, 1983) (responding to a request

21   for a ruling as to the effect of a class settlement on class members).  Nor have the parties attempted

22   to join or otherwise involve the agencies in this litigation in order to achieve some legally binding

23   effect.  Indeed, as the parties confirmed in supplemental submissions to the Court and at oral

24   argument, recent action by both the DOL and IRS indicates that the interpretation of account

25   language similar to Schwab's, and the question of whether such language creates a prohibited

---

27   [10]  Plaintiff's sole Tax Court citation does not shed light on how to interpret the correction

28   requirement, as it concerned affirmative conduct rather than agreement language, and it merely restates the general rule that a party should undo or rescind the transaction to the extent possible.  *See* Mot. for Final App. at 7 (citing *Zabolotny v. C. I. R.*, 97 T.C. 385, 399 (1991).

transaction (and what to do if it does), are in flux and may be addressed by one or both agencies in the coming months.  *See* Dep't of Labor Adv. Op. 2011-09A; Hausman Decl. Ex. B (attaching IRS Announcement 2011-81, which offers taxpayers temporary relief from the tax consequences of any prohibited transactions arising out of IRA agreements, pending further DOL action).  Accordingly, the effectiveness of the relief offered is uncertain at best.

This uncertain value of the settlement makes the release given in exchange therefor problematic.  As numerous class members have pointed out, the scope of the release would leave class members without a remedy if third parties (such as the IRS, DOL, or bankruptcy trustees) later determine that Schwab's account language did, in fact, create a prohibited transaction and that the purported fix offered in this settlement did not correct the problem.  Given these uncertainties, the parties have failed to carry their burden of demonstrating to the Court that the Settlement offers meaningful relief to the Class sufficient to extract the price of a complete release.  In short, the class is giving up something (recourse against Schwab) for possibly nothing.

c.    Remaining *Hanlon* Factors

While less important in the context of this case than the factors already discussed above, the remaining factors also weigh against approving the settlement.  First, while some degree of risk and expense is present in any case that is litigated rather than settled, here "the interests of the class will [not] be better served by resolution of the litigation than by continuation of it."  *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1387 (D. Ariz. 1989).  Indeed, the questionable value of the relief created by this settlement combined with the broad release of class members' claims outweighs any risk avoided by continuing the litigation.  Should Plaintiffs prevail at trial, they may be entitled to damages and/or indemnification of financial harms suffered by Plaintiffs, a right they are giving up under the Settlement.  Second, the risk of maintaining class action status does not appear to be great, given the commonality of interest in the class and the over-arching legal questions that would likely govern resolution of the case.  Third, given how quickly the parties settled this case, the lack of due diligence in, *e.g.*, seeking a DOL/ORS opinion or ruling on the effectiveness of the proposed settlement in protecting the class, and the lingering legal uncertainties with respect to the issues raised, this is not a case where "the parties have sufficient

19

United States District Court

For the Northern District of California

1    information to make an informed decision about settlement." *Linner v. Cellular Alaska P'ship*, 151

2    F.3d 1234, 1239 (9th Cir. 1998); *Gribble v. Cool Transports Inc.*, No. CV 06-04863, 2008 WL

3    5281665, at *9 (C.D. Cal. Dec. 15, 2008).  Fourth, although Class Counsel endorses the settlement

4    and avers that it provides meaningful relief, due to the substantive concerns the Court has noted

5    above, their views are not entitled to controlling weight.  Finally, class members' objections,

6    although small in number relative to the size of the class, were strong, substantive, and merited.

7    Class members raised many of the same concerns the Court has already noted.  Most commonly,

8    they raised the valid concern that the settlement does not assure them the transactions were not

9    prohibited and thus does not protect them from future adverse actions by third parties (including the

10   IRS), while forcing them to waive any claims against Schwab.

11            d.    Conclusion

12           Taking each of the foregoing factors into consideration, the Court concludes that the parties

13   have not made a sufficient showing that the proposed settlement provides a fair and adequate

14   resolution of the class members' claims against Schwab.  Specifically, the parties have not

15   demonstrated that the value of what the class is getting is commensurate with the value of what the

16   class is giving up.  Accordingly, the Court **DENIES** the motion for final approval of the class

17   settlement.

18   B.    Attorneys' Fees and Incentive Award

19           In light of the Court's ruling as to the proposed settlement, the Court **DENIES** the motion for

20   attorney's fees and an incentive award as moot.

21   C.    Motion to Intervene – Gregory Garmong

22           Class member Gregory Garmong has filed a motion for mandatory intervention as a named

23   plaintiff.  Docket No. 85.  While his motion largely challenges the merits of the settlement in similar

24   ways to other members of the class, he also challenges the adequacy of Plaintiff Yoshioka as a class

25   representative.  Defendants oppose the motion on the grounds that his intervention "would add

26   expense and delay resolution of this matter."  Docket No. 110 at 2.  Plaintiff opposes the motion on

27   the grounds that Plaintiff is an adequate class representative and that the settlement offers

28   meaningful relief to the class.  Docket No. 111.

United States District Court

For the Northern District of California

1    The Ninth Circuit requires a movant seeking mandatory intervention under Fed. R. Civ. P.

2    24(a)(2) to demonstrate four things:

> (1) the motion must be timely; (2) the applicant must claim a
> "significantly protectable" interest relating to the property or
> transaction which is the subject of the action; (3) the applicant must be
> so situated that the disposition of the action may as a practical matter
> impair or impede its ability to protect that interest; and (4) the
> applicant's interest must be inadequately represented by the parties to
> the action.

7    *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010) (citations omitted).

8    Plaintiff concedes that Mr. Garmong has met the first three prongs of the test.  Therefore, only the

9    adequacy of representation is at issue.

10    "This Court considers three factors in determining the adequacy of representation: (1)

11    whether the interest of a present party is such that it will undoubtedly make all of a proposed

12    intervenor's arguments; (2) whether the present party is capable and willing to make such

13    arguments; and (3) whether a proposed intervenor would offer any necessary elements to the

14    proceeding that other parties would neglect."  *Id.* (quoting *Arakaki v. Cayetano*, 324 F.3d 1078,

15    1086 (9th Cir. 2003)).  The most significant factor is the relative interests of the Plaintiff and

16    Movant.  *Arakaki*, 324 F.3d at 1086 (citing 7C Wright, Miller & Kane, § 1909, at 318 (1986)).

17    "When an applicant for intervention and an existing party have the same ultimate objective, a

18    presumption of adequacy of representation arises."  *Id.* (citations omitted).  "If the applicant's

19    interest is identical to that of one of the present parties, a compelling showing should be required to

20    demonstrate inadequate representation."  *Id.* (citing 7C Wright, Miller & Kane, § 1909, at 318-19).

21    In the instant case, Movant and Plaintiff have, at the very least, the same ultimate objective

22    in the litigation, which is to protect the assets in their IRAs from taxation and creditors.  Indeed, it

23    appears that their interests are identical.  While Mr. Garmong raises questions about Ms. Yoshioka's

24    motives and interests in initiating this litigation, as discussed above with respect to the adequacy

25    prong of class certification, he cannot point to any credible factual basis for discerning incompatible

26    interests.  In addition, Mr. Garmong offers only vague allegations of collusion, *see, e.g.*, Docket No.

27    85 ¶ 16 (raising the possibility "that the present lawsuit may be a contrived lawsuit effectively

28    initiated by the Defendants to rid themselves of potential liability of up to 4 million IRA holders in

an amount of $400 Billion through the Settlement now proposed"). Again he provides no credible factual basis for such allegations. Mr. Garmong also argues that Class Counsel has been unresponsive to his inquiries. Docket No. 85 ¶¶ 4-6. However, Class Counsel has provided the Court with a copy of the letter it sent to Mr. Garmong on November 15, 2011, addressing his concerns. *See* Kirk Decl., Docket No. 112, Ex. A. While Mr. Garmong may still disagree with counsel on the merits, counsel does not appear to have abdicated any responsibility to the class. Counsel have also expressed a willingness to increase their communications with the class to provide Mr. Garmong and other class members with more information as the case proceeds.

Beyond these concerns, Mr. Garmong's remaining arguments amount to disagreements with Plaintiff over the merits of the settlement. "Where parties share the same ultimate objective, differences in litigation strategy do not normally justify intervention." *Arakaki*, 324 F.3d at 1086 (citations omitted). Mr. Garmong is free to make his arguments as an objector and to object to any renewed proposed settlement offered by the parties. At the same time, Class Counsel has agreed to establish a communication system (*e.g.*, via a website) to share pleadings and significant developments with interested class members.

Accordingly, the Court **DENIES** the motion to intervene.

D.      Stay of the Action

At oral argument, the parties discussed the possibility of staying the litigation pending further action by the Department of Labor or the IRS that might resolve this matter without the parties incurring unnecessary costs. Neither party objects to such a stay. The Court concludes that a stay is warranted in this matter and hereby **STAYS** the matter pending further action by the Department of Labor or IRS, or until further order of the Court.

### III.    CONCLUSION

For the foregoing reasons, the Court orders as follows:

(1)    The motion for final approval of the proposed class action settlement is **DENIED**.

(2)    The motion for attorney's fees and incentive award is **DENIED**.

(3)    The motion for mandatory intervention is **DENIED**.

**United States District Court**
For the Northern District of California

1   (4)   The matter is **STAYED** pending further action by the Department of Labor or the IRS, or

2   until further order of the Court.  The parties are directed to inform the Court via joint letter of

3   any developments from the IRS or Department of Labor within 14 days of any action taken

4   by either agency.  The parties are further directed to seek leave of the Court to file any

5   motions during the pendency of the stay.

6   (5)   Further status conference is set for June 15, 2012, at 1:30 p.m.

7   (6)   Class Counsel is instructed to serve this order on all class members who filed objections with

8   the Court.

9   This Order disposes of Docket Nos. 45, 85, and 104.

11   IT IS SO ORDERED.

13   Dated:  December 22, 2011

15   EDWARD M. CHEN
United States District Judge