UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOY YOSHIOKA, | No. C-11-1625 EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| CHARLES SCHWAB CORPORATION, *et al.*, | |
| Defendants. | **(Docket No. 153)** |

## I. INTRODUCTION

Pending before the Court is Defendants' motion to dismiss Plaintiff's first amended complaint. In this putative class action, Plaintiff alleges that certain language in IRA plans offered by Defendants creates a transaction that is prohibited by § 4975 of the Internal Revenue Code, thus causing the accounts to loose their tax exempt status. This Court previously stayed this action pending the issuance of regulatory guidance by the Department of Labor or the IRS that might resolve the issues in this case.

On June 19, 2012, this Court partially lifted the stay to allow Defendants to file this motion to dismiss. Defendants filed a motion to dismiss on August 3, 2012. In response, Plaintiff filed a First Amended Complaint ("FAC") on August 24, 2012. On September 7, 2012, Defendants filed the instant motion to dismiss Plaintiff's first amended complaint.

///

///

///

## II. FACTUAL & PROCEDURAL BACKGROUND

Plaintiff opened an IRA account with Defendants in December 2010. FAC ¶ 2. At the same time, she opened a Schwab One Account "to hold personal, non-IRA assets." FAC ¶ 21. Upon opening the accounts, she signed an IRA Account Agreement and a Schwab One Account Agreement. FAC ¶¶ 7, 21. She brings this putative class action on behalf of all current holders of IRA accounts with Defendants, with certain limited exceptions. FAC ¶ 34. She alleges that certain language in the IRA Account Agreement and Schwab One Account Agreement causes prohibited transactions under § 4975 of the Internal Revenue Code, which would cause the IRA account to lose its tax-exempt status under § 408 of the Code. 26 U.S.C. §§ 408(e)(2), 4975.

Section 408(e)(2) provides that if an individual with an IRA engages in a prohibited transaction as defined in § 4975, the IRA loses its tax exempt status as of the first day of the taxable year in which the prohibited transaction occurred. 26 U.S.C. § 408(e)(2). Section 4975 defines prohibited transactions as, "any direct or indirect –

> (A) sale or exchange, or leasing, of any property between a plan and a disqualified person;
>
> (B) lending of money or other extension of credit between a plan and a disqualified person;
>
> (C) furnishing of goods, services, or facilities between a plan and a disqualified person;
>
> (D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;
>
> (E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account; or
>
> (F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

*Id.* § 4975(c)(1).

The parties do not dispute that, as fiduciaries to the plan, Defendants are disqualified persons within the meaning of § 4975(e)(2)(A). Under this section, a "disqualified person" includes a "fiduciary," which is defined as any person who "exercises any discretionary authority or

discretionary control respecting management . . . or disposition of [the plan] assets." 26 U.S.C. § 4975(e)(2)(A) & § 4975(e)(3)(A). IRA owners, therefore, fall within the definition of a fiduciary and are thus disqualified persons under 26 U.S.C. § 4975(e)(2)(A).

Plaintiff alleges that several sections of her IRA Account Agreement and one section of her Schwab One Account Agreement run afoul of § 4975.

A.  <u>Challenged Provisions in IRA Account Agreement</u>

Plaintiff challenges one paragraph of Section 5 of the IRA Account Agreement, which reads:

> If you owe money to Schwab as the result of activity in any other Schwab account in which you are an account holder of have a financial interest, and there are assets available in your IRA Account to fully or partially satisfy this debt, you agree that upon Schwab's written demand you will execute all documents necessary to effect a distribution from you IRA, and such funds shall immediately be paid over to Schwab in order to satisfy your indebtedness to Schwab.

FAC Ex. A at 5. Plaintiff alleges that "Defendants knew or should have known that requiring an IRA owner to pledge their IRA assets in the event of a loss sustained in the IRA owner's other, non-IRA accounts would result in the IRA owner engaging in a prohibited transaction and thus losing the exempt status of their retirement savings account." FAC ¶ 16.

Plaintiff also challenges Sections 6 and 7 of the IRA Account Agreement:

> **6. Payment of Indebtedness**
> You agree to make payment of any indebtedness related to your Account, including, but not limited to, any such indebtedness that results from instructions provided to Schwab by you, your agent or any attorney-in-fact under a power of attorney or Investment Advisor authorized to make transactions in your Account. We may elect anytime, with or without notice, to make any debit balance or other obligation related to your Account immediately due and payable. We may report any past-due account to a consumer and/or securities credit reporting agency. We may also refer your Account to a collection agency.
>
> **7. Security for Indebtedness**
> As security for the repayment of all present or future indebtedness owed to us by any Schwab IRA account holder under the Account Agreement or otherwise, each Schwab IRA account holder grants us a continuing security interest in and lien on, and a right of setoff with respect to, all securities and other property that are, now or in the future, held, carried, or maintained for any purpose in or through the Schwab IRA and, to the extent of this account holder's interest, in or through any present or future Account with us or our affiliates in which the account holder has an interest.

3

FAC Ex. A at 5. Plaintiff alleges that Section 6 creates a prohibited transaction by "requiring an IRA owner to agree to be personally liable to the Defendants in the event of any indebtedness related to the IRA." FAC ¶ 18. Section 7, she claims, creates a prohibited transaction by giving Defendants, who are disqualified persons, a security interest in her IRA. FAC ¶ 20.

B.  Challenged Provision in Schwab One Account Agreement

Plaintiff additionally challenges a provision in her Schwab One Account, which reads:

> **7. Security for Indebtedness**
> As security for the repayment of all present or future indebtedness owed to us by any account holder under the Schwab One® Account Agreement or otherwise, each account holder grants to us a continuing security interest in and lien on, and a right of setoff with respect to, all Securities and Other Property that are, now or in the future, held, carried, or maintained for any purpose in or through the Schwab One® Account, and, to the extent of such account holder's interest, in or through, any present or future account with us or our affiliates in which the account holder has an interest. If you owe money to Schwab as the result of activity in your Account and there are assets available in any Individual Retirement Account (IRA) that you hold at Schwab which could fully or partially satisfy the debt, you agree that upon Schwab's written demand, you will execute all documents necessary to effect a distribution from your IRA and agree to pay or cause such funds to be paid immediately to Schwab in order to satisfy your indebtedness to Schwab.

FAC Ex. B at 14. Plaintiff alleges that this section creates a prohibited transaction by giving Defendants a security interest in her IRA and by requiring her to agree to pay any debts out of her IRA account. FAC ¶ 24.

C.  Applications

In her complaint, Plaintiff also points out that Defendants' applications for Schwab One and IRA accounts contain language similar to the challenged clauses. The current Schwab One Account Application Agreement, for example, provides that the account holder grants to defendants "a first, perfected and prior lien on, a continuing security interest in, and right of set-off with respect to, all property that is, now or in the future, held, carried or maintained for any purpose in or through Schwab." FAC Ex. C at 6. The IRA Account Application Agreement contains an identical Section 6 to the 2010 IRA Account Agreement quoted above. FAC Ex. D at 6.

///

///

4

D.  The IRA Plan

The language Plaintiff challenges above is contained in the January 2010 versions of the IRA Account Agreement and Schwab One Account Agreement. The IRA Account Agreement contains a provision defining "Account Agreement" as "[t]he agreement you make with us when you open a Schwab IRA, consisting of the IRA Application; the Account Agreement for your Schwab IRA; the IRA Plan Adoption Agreement (if any); the Charles Schwab & Co., Inc. Individual Retirement Plan; and any other written agreements between you and us concerning the Schwab IRA, all as amended from time to time." FAC Ex. A at 3. The Schwab One Account contains a provision similarly defining the Schwab One Account Agreement, and explicitly that the agreement includes amendments to the original agreements made "from time to time." FAC Ex. B at 4.

With their motion, Defendants submitted the full text of the Charles Schwab & Co., Inc. Individual Retirement Plan ("IRA Plan").[1] Def.'s Request for Judicial Notice in Support of Mot. to Dismiss ("RJN") Ex. A. Section 5.2 of the IRA Plan, titled "Restrictions on the Fund," provides:

> Neither the IRA Account Holder nor any Beneficiary may sell, transfer or pledge any interest in this IRA in any manner whatsoever, except as provided by law or this Agreement, nor engage in any transaction prohibited under Section 4975 of the Code. The assets in this IRA shall not be responsible for the debts, contracts or torts of any person entitled to distributions under this Agreement.

*Id.* at 15.

E.  Amendments

As of December 31, 2010, Defendants made relevant changes to the IRA Account Agreement. The new IRA Account Agreement omitted Section 7 and the paragraph in Section 5 that Plaintiff challenges. RJN Ex. C at 12-13. It retained, however, the language Plaintiff challenges about payment of indebtedness in Section 6. *Id.*

---

[1] In connection with their motion, Defendants file a Request for Judicial Notice of a number of documents related to Plaintiff's account, including the IRA Plan, Plaintiff's IRA account application, the 2011 IRA Account Agreement, and October 2011 Important Account Agreement and Disclosure Information ("October 2011 Amendments"). They also request judicial notice of an IRS announcement concerning provisions of this sort in IRA agreements, and judicial orders in several cases similar to the one at bar. As Plaintiff does not oppose the request, this Court considers the documents submitted by Defendants for the purposes of this motion.

1    Defendants made changes to both account agreements in October 2011 ("October 2011
2 Amendments"). RJN Ex. D. The October 2011 Amendments retained Section 7 of the Schwab One
3 Account Agreement, but inserted language at the beginning of the section reading "Note: This
4 section does not apply to any tax qualified accounts subject to the prohibited transaction rules of the
5 Internal Revenue Code or ERISA, or any indebtedness arising therefrom." *Id.* at 8. The
6 amendments changed the introduction to the IRA Agreement to add the following language:

> Any language in this Account Agreement or related agreements that may conflict or be inconsistent with the Charles Schwab & Co., Inc. Individual Retirement Plan, including without limitation Sections 5.2 or 5.8 of the Plan, or Sections 408 or 4975 of the Internal Revenue Code, and the regulations thereunder, shall be interpreted to be consistent and in compliance with that Plan and those Sections of that Code and regulations thereunder. To the extent it is not possible to interpret such language to be consistent and compliant with that Plan or these Code provisions and regulations, then such language shall be of no force or effect to the extent of such inconsistency or noncompliance. This Section shall be effective retroactive to the first date on which the agreement concerning the Schwab IRA was entered into by the Account Holder.

RJN Ex. D at 9 of Section 7.

F.    The Lawsuit

   In between these two rounds of modifications, Plaintiff filed the case at bar on April 4, 2011. Docket No. 1. In her amended complaint, she alleges that she has been harmed in several ways by the provisions that she alleges create prohibited transactions. She alleges that because of these provisions, the tax exempt status of her IRA is uncertain, and that in order to resolve this uncertainty with the IRS, she would have to resort to the self-help provisions of the tax code, incurring $1,500 in fees, plus attorney fees. FAC ¶ 29. Without doing so, she alleges, she is at risk of audit and runs risks pertaining to estate planning and creditor protection.[2] *Id.* She also alleges that she has suffered harm because she is not able to rollover or transfer her IRA to a different custodian without risking tax liabilities. FAC ¶ 30. She claims that transferring her account to another IRA account would

---

[2] While Plaintiff's complaint offers no explanation of how a prohibited transaction could cause problems with protection from creditors, in this motion, she cites a bankruptcy case where the court found that an IRA that had been the subject of a prohibited transaction was no longer immune from distribution to the bankrupt party's creditors. *See In re Daley*, 459 B.R. 270, 277-79 (Bankr. E.D. Tenn. 2011).

1  create a risk of a claim of excess contribution under 26 U.S.C. § 4973, but that transferring to a non-
2  IRA account would cause loss of tax deferral and a large tax bill. *Id.*

3  In addition to the concerns about prohibited transactions under § 4975, Plaintiff argues that
4  the challenged provisions in the Agreements cause her to have tax liability under § 408(e)(4), which
5  provides that "[i]f, during any taxable year of the individual for whose benefit an individual
6  retirement account is established, that individual uses the account or any portion thereof as security
7  for a loan, the portion so used is treated as distributed to that individual." 26 U.S.C. § 408(e)(4).
8  Plaintiff brings claims for violation of the California Consumer Legal Remedies Act (CLRA), for
9  violation of California's unfair competition law, for breach of contract, for breach of fiduciary duty,
10 and for declaratory relief.

G. <u>IRS Announcement</u>

In their motion, Defendants cite the fact that the IRS has issued an announcement regarding IRAs with provisions such as the ones at issue here. IRS Announcement 2011-81, RJN Ex. E. The announcement cites several earlier advisory opinions of the Department of Labor (DOL), which has the authority to issue interpretations of § 4975. *Id.* In October 2011, the DOL had issued an advisory opinion "regarding circumstances under which an individual IRA owner's agreement to indemnify a broker in order to cover indebtedness of, or arising from, the individual's IRA with the broker would be an impermissible 'extension of credit,' as described in § 4975(c)(1)(B) of the Code and whether" any prohibited transaction would fall within certain exceptions to § 4975. *Id.* The advisory opinion had stated that an IRA owner's agreement to indemnify a broker for any losses sustained or tax liabilities incurred in connection with entering into futures contracts would create a prohibited transaction, and that such transaction would not fall into an exception allowing extensions of credit for an IRA's ordinary operating expenses. DOL Advisory Opinion 2011-09A. The IRS announcement noted that since the DOL advisory opinion, similar concerns had been raised about situations where an IRA owner granted a security interest "among the non-IRA accounts and the IRA (referred to collectively as cross-collateralization agreements) with a broker or other financial institution." *Id.* An earlier DOL opinion had found that such cross-collateralization agreements create prohibited transactions. DOL Advisory Opinion 2009-03A. However, the DOL had since

indicated that it was considering future action clarifying the classification of such actions, including consideration of a request to create a class exemption from § 4975 for such transactions.

Given the ongoing consideration of the issue by the DOL, the IRS Announcement concluded that:

> Pending further action by the DOL and until issuance of further guidance from the IRS superseding this announcement, the IRS will determine the tax consequences relating to an IRA *without* taking into account the consequences that might otherwise result from a prohibited transaction under § 4975 resulting from entering into any indemnification agreement or any cross-collateralization agreement similar to the agreements described in DOL Advisory Opinions 2009-03A and 2011-09A, provided there has been no execution or other enforcement pursuant to the agreement against the assets of an IRA account of the individual granting the security interest or entering into the cross-collateralization agreement.

*Id.* (emphasis added).

### III.  DISCUSSION

A.  Standing and Ripeness – Legal Principles

Defendants brings a 12(b)(1) motion to dismiss Plaintiff's complaint, arguing that she lacks standing to sue because her claim is not yet ripe for adjudication. Defendants argue that Plaintiff's claim is not ripe because she has demonstrated no imminent threat of injury.[3]

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982).

> To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–72, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

---

[3] In their reply, Defendants also argue that certain statements in Plaintiff's opposition to the motion call into question whether Plaintiff meets the redressability requirement to establish standing. As Plaintiff's claim is not yet ripe for adjudication, this Court need not reach this issue.

*Bennett v. Spear*, 520 U.S. 154, 162 (1997). "Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a [Federal] Rule [of Civil Procedure] 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir.2010). "A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc*., 328 F.3d 1136, 1139 (9th Cir.2003).

The doctrine of ripeness is related to the question of standing, and concerns "the appropriate timing of judicial intervention." *Renne v. Geary*, 501 U.S. 312, 320 (1991). One timing concern is "whether the harm asserted has matured sufficiently to warrant judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Pacific Legal Foundation v. State Energy Resources Conservation & Dev. Com*., 659 F.2d 903, 915 (9th Cir.1981). The Ninth Circuit has recognized that "in many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). "The "basic rationale [of ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

In the context of a private contract case, the Ninth Circuit has held that "the appropriate standard for determining ripeness of private party contract disputes is the traditional ripeness standard, namely, whether 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 671 (9th Cir.2005). More specifically, "[t]he 'central concern [of the ripeness inquiry] is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122–1123 (9th Cir.2010) (citing *Richardson v. City and County of Honolulu* 124 F.3d 1150, 1160 (9th Cir.1997)).

In *Chandler*, plaintiff sued his insurer over a reimbursement dispute after his car was rear-ended. The plaintiff had been partially reimbursed by the insurer of the other driver, but had not sued that third party's insurer. The court held that the plaintiff's claim was not ripe for adjudication until he had attempted and failed to sue that third party, thus showing injury. *Id.* ("Plaintiff's claims involve future events that are too uncertain and speculative to permit Plaintiff to proceed with his lawsuit."). Similarly, where a claim involves outcomes dependent on an uncertain event, such as the resolution of another case, courts have dismissed the claim as unripe. *See Bhatia v. Office of the United States Atty.*, No. CV–09–5581 SBA, 2011 U.S. Dist. LEXIS 36461, 2011 WL 1298763 (N.D .Cal. Mar. 29, 2011) (dismissing claims as unripe where injury was dependent on outcome of ongoing criminal case).[4]

Similar ripeness requirements apply to cases involving potential enforcement activities by public agencies. Thus, for instance, when the alleged injury is based on the plaintiff's fear of prosecution by the government, the Ninth Circuit has held that plaintiffs must show a "genuine threat of imminent prosecution" to establish standing. *Washington Mercantile Ass'n v. Williams*, 733 F.2d 687, 688 (9th Cir.1984) (citing *Steffel v. Thompson*, 415 U.S. 452, 458-59 (1974)); *see also Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983) ("a plaintiff must demonstrate a genuine threat that the allegedly unconstitutional law is about to be enforced against him"). "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 656 (9th Cir. 2002) (quoting *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir.1983)). "A plaintiff may allege a future injury in order to [establish injury-in-fact], but only if he or she 'is immediately in danger of sustaining some direct injury as the result of the challenged official

---

[4] However, claims may be ripe for adjudication even where the event in question is remote in time so long as there is a present effect. In *Robinson*, plaintiff and defendant were parties to a long-term lease which provided for rent adjustment in the thirty-first and sixty-first years of the lease. *Robinson*, 394 F.3d at 668. The parties disagreed as to their interpretation of this provision, and when they renegotiated the lease they included this disagreement in a lease amendment. When one of the parties tried to sell its interest, it could not because of the disagreement. The court agreed that their case was ripe for decision. *Id.* at 672. What was significant was the fact that the uncertainty about the future event had a present concrete impact.

10

1  conduct and the injury or threat of injury is both real and immediate, not conjectural or
2  hypothetical.'" *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).
3       In *Thomas v. Anchorage Equal Rights Comm'n*, the plaintiffs were landlords with religious
4  objections to unmarried cohabiting couples who sought to challenge laws prohibiting housing
5  discrimination based on marital status. 220 F.3d 1134, 1137 (9th Cir. 2000). The Ninth Circuit held
6  that:

> In evaluating the genuineness of a claimed threat of prosecution, we look to whether the plaintiffs have articulated a "concrete plan" to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute.

11 *Id.* at 1139. In that case, the court found that the plaintiffs could not establish standing because they
12 failed to make a sufficient showing under any of the three prongs. *Id.* at 1139-40. While they stated
13 that they would turn away potential renters who were unmarried couples, the court found this stated
14 intent too speculative as any violation of the law would be contingent on an unmarried couple at
15 some point in the future seeking to rent from the plaintiffs. *Id.* The court also found that there was
16 neither an individual threat of prosecution, nor a history of the relevant agency vigorously enforcing
17 the statute. *Id.* at 1140. In the twenty-five years the statutes had been on the books, there had been
18 no criminal prosecutions, and only two civil enforcement actions both of which had been
19 precipitated by complaints from actual tenants. *Id.*
20      Even if a plaintiff has already violated the statute in question, she may not have standing to
21 challenge it if there is no indication that the relevant agency intends to prosecute her for the
22 violation. In *Sacks v. Office of Foreign Assets Control*, for example the plaintiff had traveled to Iraq
23 on numerous humanitarian missions to deliver medicine and medical supplies between 1990 and
24 2003. 466 F.3d 764, 767 (9th Cir. 2006). In so doing, he violated at least two separate components
25 of the sanctions the United States then had in effect against Iraq: a travel ban, and a ban on exporting
26 medicine unless the exporter complied with certain licensing and regulatory requirements. *Id.*
27 Though he had been assessed a penalty for violating the travel ban after one of his trips, he had not
28 been assessed a penalty for violating the ban on unlicenced export of medicine. *Id.* at 769-70, 772.

11

1  Though the Ninth Circuit found that the plaintiff had standing to challenge the travel ban, it
2  ultimately found that his challenge to the ban on the unlicenced export of medicine was not ripe
3  because he had not established an imminent threat of prosecution for violations of that component of
4  the Iraq sanctions. *Id.* at 771-72.

5        The court considered the factors identified in *Thomas*, and concluded that while the plaintiff
6  had demonstrated the first factor (by actually violating the law), and the third factor (the government
7  had a history of enforcing the medical export restrictions against others), he could not establish that
8  he personally faced an imminent threat of prosecution. *Id.* at 772-73. The court found that the fact
9  that government had assessed penalties only for violations of the travel ban, even though it was well
10 aware that he had also violated the medical export ban, "indicate[d] that the government does *not*
11 intend to penalize him for any of his numerous violations of the Medicine Restrictions." *Id.* at 774.
12 *Cf. Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007) (holding that plaintiffs had not
13 established imminent threat of prosecution under a criminal law where they were never directly
14 threatened with prosecution, and where the state attorney general had issued a policy statement that
15 it would not enforce the challenged criminal law under circumstances like those the plaintiffs were
16 alleging).

17 B.     Ripeness in the Instant Case

18       Considering the factors identified in *Thomas*, Plaintiff has failed to allege the kind of
19 imminent threat of prosecution necessary to establish standing. She has arguably established the
20 first factor - a "concrete plan" to violate the law - in that she claims that the language in the Account
21 Agreements has already created a prohibited transaction. Though there is some question as to
22 whether the challenged language actually creates a prohibited transaction - a fact which Defendants
23 vigorously dispute - the fact that the action that allegedly violates the statute in question has already
24 occurred weighs in favor of standing here. The other two *Thomas* factors, however, weigh strongly
25 against standing, as Plaintiff is unable to articulate either an individual threat of prosecution or a
26 generalized history of IRS enforcement actions against individuals with similar language in their
27 IRA account agreements. Not only is there no history of IRS enforcement, the IRS has taken an
28 affirmative stance that it will *not* consider potential prohibited transactions created by such language

1  for the foreseeable future.  This makes the threat of prosecution in this case even more speculative
2  than in *Sacks*, where the government had a history of enforcing the challenged regulation against
3  individuals other than the plaintiff.

4  In her opposition, Plaintiff cites *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006).
5  There, the Second Circuit considered objections to a settlement of claims against defendants who
6  had advised the plaintiff class to use tax shelters that were ultimately found invalid under the tax
7  code. *Id.* at 260.  The court held that class members who had not yet been audited had standing,
8  finding that they could still be subject to audit, and that even in cases where the statute of limitations
9  for an audit had passed, there were exceptions to the limitations period which might apply.  *Id.* at
10 265.  The court also found that they had "taken costly and time-consuming steps to rectify errors in
11 their past or future tax filings."  *Id.*  Even those who had not followed the tax advice to completion
12 had "nonetheless [taken] some steps in reliance on the advice, which . . . entailed time and money."
13 *Id. Denny* is distinguishable from the case at bar, however, in that the class representatives in that
14 case had all been assessed a tax penalty for using the tax shelters.  *Id.* at 262.  There was thus no
15 dispute that the IRS could and would assess penalties against class members who were subject to
16 audit.  *Id.*  In this case, the IRS has specifically issued an announcement that it is not taking
17 enforcement action against individuals in Plaintiff's situation.  Unlike *Denny*, the government's
18 position here is not settled, and thus the threat of enforcement more remote.

19 Further, even though some DOL advisory opinions have indicated that language similar to
20 the challenged provisions here may create prohibited transactions, these advisory opinions did not
21 consider the exact language at issue here.  There are a number of provisions that may differentiate
22 this case from the facts in the DOL advisory opinion.  First, there are disputes about the proper
23 interpretation of the challenged provisions.  For example, Defendants argue that one of the
24 challenged clauses in the account agreement does not create a present lien, and that another only
25 creates a permissible lien on the IRA for expenses incidental to IRA, not expenses incidental to other
26 non-IRA accounts.  Furthermore, there is a fundamental question whether the clause in the IRA Plan
27 prohibiting violations of § 4975, which would obviate any possible violation of § 4975, controls
28 over contrary language in the account agreements.  Given the serious disputes about the effect of the

specific language at issue here, and the fact that neither the DOL nor the IRS appear to have addressed this specific contractual language, any harm to Plaintiff is significantly more speculative than in *Denny*.

Indeed, in a case directly analogous to the one at bar, a district court dismissed a class action against Merrill Lynch for lack of standing. *Coffey v. Merrill Lynch Pierce Fanner and Smith, Inc.*, CV–11–5860–JFW, Docket No. 46, at 2 (C.D. Cal. Nov. 16, 2011). The plaintiff in that case also alleged that certain clauses (which appear to be similar to those in the case at bar) in his account agreements caused his IRA account to lose its tax exempt status by creating prohibited transactions under the tax code. *Id.* at 1. The district court dismissed the case for lack of standing because the plaintiff did not allege that the IRS had actually sought to impose any tax liability on his IRA, that the IRS had claimed that a prohibited transaction had caused a distribution of funds from his IRA, or that he reported funds from his IRA as income on his taxes for the relevant years. *Id.* at 2. Additionally, the plaintiff in that cause did not allege that he continued to have an IRA account with Merrill Lynch at the time of the dismissal. *Id.*

Here, Plaintiff has failed to allege the kind of imminent injury that would give her standing in this case. Like the plaintiff in *Coffey*, she has not alleged that the IRS has indicated to her that she has incurred any tax liability because of prohibited transactions involving her IRA account. She has not alleged that she treated her IRA account as taxable when completing her tax return. Though her situation is distinguishable from the plaintiff's in *Coffee* in that she continues to have an IRA account with Defendants, recent amendments to the various policy documents would appear to prospectively alleviate many, if not all, of the problems she raises.

Plaintiff also points to an unpublished district court case from Hawai'i for the proposition that "the fear or anxiety of future harm" can be enough to establish standing. *Baker v. Castle & Cooke Homes Hawaii, Inc.*, CV-11-00616-SOM, 2012 WL 1454967 (D. Haw. Apr. 25, 2012). In that case, the threat of harm was more certain than is the case in Plaintiff's situation. There, the plaintiffs alleged that pipe fittings used in their home were in danger of failing, thereby causing destruction to the plaintiffs' property and exposing the plaintiffs to dangerous toxins. *Id.* at \*4. They supported their allegations with the declaration of an engineer who stated that the pipe fittings

14

1 "'*will* corrode until they catastrophically fail' and that the corrosion '*cannot be stopped*.'" *Id.*
2 (emphasis added). Plaintiff has offered nothing approaching this level of certainty in this case.

3 C. <u>Effect of IRS Announcement</u>

4 The parties dispute the significance of the IRS announcement to the standing analysis in this
5 case. Plaintiff does not dispute that the IRS announcement applies to the type of provisions that she
6 challenges in her account agreements, or that under the announcement she has no imminent risk of
7 the IRS imposing tax liability on her IRA because of the challenged provisions. Pl.'s Opp. to Mot.
8 to Dismiss at 7-8. Instead, she offers several arguments for why the IRS announcement does not
9 undermine her standing to bring the case, though none are persuasive.

10 Plaintiff argues that the IRS is not the proper agency to grant relief since it is the DOL that is
11 charged with interpreting § 4975. While the DOL has the authority to *interpret* § 4975, Plaintiff's
12 claim concerns the *enforcement* of § 4975, which she does not dispute lies with the IRS. Indeed, her
13 suggestion that the relief she seeks must come from the DOL rather than the IRS is contradicted by
14 her statements elsewhere in the record. In her complaint, she asks this Court to "order that
15 Defendants enter into a closing agreement with the Internal Revenue Service to resolve the issues set
16 forth herein regarding the status of the Putative Class Members' IRAs," but does not mention the
17 DOL at all. Compl. at 17. Her opposition to Defendants' motion similarly reiterates that the only
18 way for her to "receive complete certainty in regards to her retirement plan" is for this Court to order
19 Defendants to enter such an agreement with the IRS, or for her to file a request with the IRS for an
20 applicable waiver. Pl.'s Opp. to Mot. to Dismiss at 12.

21 Plaintiff also raises the concern that any action by the DOL would address only problems the
22 challenged clauses create under § 4975, and not under § 408 and § 72 of the tax code. Pl.'s Opp. to
23 Mot. to Dismiss at 9. Nowhere in her complaint does Plaintiff raise concerns that the challenged
24 provisions violate § 72 of the tax code, so any attempt to base standing on the threat of violations of
25 this section is perplexing.[5] Plaintiff's argument on § 408 has more weight, as it appears that part of

---

[5] Section 72 is lengthy, and Plaintiff does not identify the relevant subsection. It seems possible, however, that she is concerned with the following section:

**Assignments or pledges**. – If during any taxable year a participant or

1  § 408 could be grounds for a violation independent of § 4975 by providing that any portion of an
2  IRA pledged as a security for a loan is treated as distributed for tax purposes. 26 U.S.C. § 408(e)(4).
3  Plaintiff does not allege, however, that the IRS has informed her that it intends to treat any portion
4  of her IRA as distributed under this provision or that she must treat any portion as distributed in
5  filing her taxes. While the IRS announcement may not specifically weigh against finding standing
6  based on threat of prosecution under § 408(e)(4) (as opposed to § 4975), the fact remains that even
7  without the announcement, Plaintiff has failed to allege more than speculative danger of
8  enforcement action under this section. Moreover, it is possible that an IRS ruling on § 4975 will
9  address or affect the interpretation of § 408(e)(4).

10  Plaintiff further argues that the IRS announcement does not defeat standing because "the IRS
11  does not have the power to ignore the laws which Congress has passed." Pl.'s Opp. to Mot. to
12  Dismiss at 8. While this may be true, the Supreme Court has held that "an agency's decision not to
13  prosecute or enforce, whether through civil or criminal process, is a decision generally committed to
14  an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). While the Court
15  has found exceptions to this rule where the language of a statute requires an agency to bring an
16  enforcement action under certain clearly specified conditions, Plaintiff offers nothing to indicate that
17  this exception would apply here. *Id.* at 832-33 (judicial review may be appropriate where "Congress
18  [has limited] an agency's exercise of enforcement power . . . either by setting substantive priorities,
19  or by otherwise circumscribing an agency's power to discriminate among issues or cases it will
20  pursue.").

21  Finally, Plaintiff argues that the announcement provides only temporary relief. The fact that
22  the IRS may at some later point rescind Announcement 2011-81 might give Plaintiff standing in the
23  future, but it does not help her argument that her claim is currently ripe for adjudication. The IRS
24  announcement indicates that the IRS is unlikely to take further action until such a time as the DOL

---

beneficiary assigns (or agrees to assign) or pledges (or agrees to
pledge) any portion of his interest in a qualified employer plan, such
portion shall be treated as having been received by such individual as
a loan from such plan.

26 U.S.C. § 72(p)(1)(B).

16

1 issues further guidance. Plaintiff specifically raises the concern that the DOL may not take further
2 action on this question for a considerable amount of time, undermining any argument that the IRS is
3 likely to reverse its position in the near future. Pl.'s Opp. to Mot. to Dismiss at 9. It is just this kind
4 of landscape of unsettled administrative interpretation that ripeness doctrine requires courts to avoid.
5 *See Abbott Labs. v. Gardner*, 387 U.S. at 148-49.

D. <u>Other Alleged Harms</u>

Plaintiff asserts that the IRS announcement "makes no determination regarding the qualified status of the account," but only states that the IRS will not take into account tax consequences from potentially prohibited transactions stemming from the offending provisions. Pl.'s Opp. to Mot. to Dismiss at 11. Relatedly, she asserts that she has standing because of the threat of actions against her by state tax agencies and creditors, and because she is unable to move her IRA to a new management company. Like the threat of federal tax liability, these allegations of harm are too speculative to establish that Plaintiff's claims are ripe for adjudication.

As an initial matter, Plaintiff's complaint makes no allegations about threat of harm from state tax authorities. In her opposition to the motion, she does not allege any facts that would indicate an imminent risk of any kind of finding of state court tax liability. Pl.'s Opp. to Mot. to Dismiss at 11. Nor does she make any allegations in her opposition or complaint that indicate that there is an immediate danger of creditors taking steps to attach her IRA assets as a result of any putative violation of § 4975. *Id.*; FAC ¶ 29. Plaintiff cites a bankruptcy case finding that provisions in a debtor's IRA account agreement that created a lien on the IRA constituted a prohibited transaction. *In re Daley*, 459 B.R. 270, 277-79 (Bankr. E.D. Tenn. 2011). The court in *Denny* concluded that the IRA had lost its tax exempt status and thus was not exempt from distribution to creditors. *Id.* However, in the case at bar, Plaintiff has not alleged that she is in bankruptcy proceedings or that she has any creditors who have in any way indicated an intention to pursue the assets in her IRA.

Plaintiff's allegations of harm because of the inability to transfer her IRA to another firm are also speculative. She does not allege that she has tried to transfer her IRA, that she wishes to do so, or that she has been informed by tax authorities or other brokers that transferring her IRA would

17

create the problems she alleges. Pl.'s Opp. to Mot. to Dismiss at 11-12. She alleges simply that "[i]f a different custodian were to offer higher interest rates, lower trading commissions, or better investment options, she no longer has the ability to move her assets to that custodian." *Id.* at 12. Plaintiff's argument that she has standing because of her alleged inability to take an action (which is only conclusorily alleged) and as to which she has indicated no inclination to take is unconvincing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) ("'some day' intentions-without any description of concrete plans, or indeed even any specification of when the some day will be-do not support a finding of the 'actual or imminent' injury that our cases require"); *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 437 (7th Cir. 1994) ("The absence of an allegation that [the plaintiff] at least intends to terminate his lease deprives him of standing" to challenge an early termination clause).

This Court finds that Plaintiff has failed to establish the kind of imminent threat of harm necessary to establish that her claims are currently ripe for adjudication. If at some future date the threat of IRS enforcement or other potential harms she asserts moves beyond the realm of the speculative, she may seek to bring her claims in a new lawsuit.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's complaint is **DISMISSED** without prejudice.

Class Counsel is instructed to serve this order on all class members who previously filed objections with the Court.

This order disposes of Docket No. 153. The Clerk of Court shall enter judgment and close the case.

IT IS SO ORDERED.

Dated: November 27, 2012

_____
EDWARD M. CHEN
United States District Judge